*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN BUTSINAS,

Defendant-Appellant.

FOR PUBLICATION
May 28, 2025
10:05 AM

No. 364778
Macomb Circuit Court
LC No. 2014-000167-FC

Before: GADOLA, C.J., and MURRAY and REDFORD, JJ.

REDFORD, J.

Defendant, John Butsinas, appeals as of right his jury-trial convictions of four counts of first-degree criminal sexual conduct ("CSC-I"), MCL 750.520b(2)(b). The trial court sentenced defendant to concurrent terms of 375 to 720 months' (31¼ to 60 years) imprisonment for each count of CSC-I. We affirm.

## I. FACTUAL BACKGROUND

This action arises from defendant's second trial for the sexual abuse of Kr over a four-year period from 2008 to 2012. Defendant was first tried for the sexual abuse of Kr and witness intimidation in 2015. A jury convicted defendant of five counts of CSC-I and two counts of witness intimidation, MCL 750.122(3). Defendant appealed his convictions in this Court. In 2018, a majority of a panel of this Court affirmed defendant's convictions for witness intimidation, but vacated his convictions for CSC-I and remanded for a new trial. *People v Butsinas*, unpublished per curiam opinion of the Court of Appeals, issued January 23, 2018 (Docket Nos. 327796 and 327799).[1] The panel vacated defendant's CSC-I convictions on the basis that the prosecution

---

[1] Judge O'BRIEN concurred in part and dissented in part because she agreed that sufficient evidence supported defendant's convictions for witness intimidation, but disagreed that defendant's CSC-I convictions should be vacated. *Butsinas* (O'BRIEN, J. concurring in part and dissenting in part), unpub op at 1.

committed a *Brady* violation[2] by withholding two Children's Protective Services reports ("CPS") from 2010 and 2013. *Id*. at 4-12. Between defendant's first and second trial, defendant identified a third CPS report and initiated an administrative proceeding to expunge his name from the Michigan Child Abuse and Neglect Central Registry (the "Central Registry"). In 2022, defendant represented himself at his second trial.

Defendant lived with his girlfriend, Elizabeth Smith, and her three daughters for several years. Defendant first resided with the family in a trailer and later in a house on Crocker Street in Mt. Clemens. Kr testified that defendant sexually abused her over a four-year period starting at the trailer. She explained that defendant inappropriately touched her almost daily and forced her to engage in penile-vaginal penetration frequently. This would occur both when others were home and when no one was home. She recalled one instance in which defendant reached into her pants to grab her vagina over her underwear when Smith was in an adjacent room.

Kr described in detail two incidents when defendant engaged in forcible penile-vaginal penetration with her at the trailer. One of these incidents occurred when Kr was sleeping alone in the living room on an air mattress. The other occurred when defendant called Kr into his bedroom to give him a massage. Kr described a third incident at the trailer when defendant forced her to perform oral sex on him after Smith and Kr's younger sister, C, left the bedroom. Kr did not disclose the abuse to anyone at that time because defendant threatened to kill her and her family.

Kr testified that the sexual abuse continued at the Crocker house. She described two more incidents of penile-vaginal penetration. In the first incident, defendant called Kr upstairs to give him a massage and argued with her before forcing her to engage in penile-vaginal penetration. Smith was home during this incident. In the second incident, defendant called Kr into his bedroom for a massage. When Kr arrived, defendant made her watch pornography during the penetration. Kr could not recall if Smith was home during the second incident. Kr recalled a third incident at the Crocker house when defendant called Kr to give him a massage and told her to suck his penis. Kr became angry and bit defendant's penis after he forced her head over his penis. At trial, Kr acknowledged that her testimony was far more detailed than her previous testimony and disclosures. She also acknowledged that her statement to medical staff and police officers that she was raped daily was inaccurate.

Outside of these instances, Kr recalled that defendant often made both her and C massage him. He would also make Kr and C kiss his ring or hand. Defendant made sexual comments about Kr's body in front of the family and strangers. Kr recalled one instance when Smith overheard defendant ask Kr about her period. Kr testified that defendant continued to threaten her and her family if she told anyone about the abuse. Despite these threats, Kr told Smith about one incident when defendant asked Kr for a "blow job." Ultimately, the sexual abuse ceased in December 2012.

In April 2013, Kr disclosed the sexual abuse to a friend at a teen-lock-in at a church. Her disclosure made its way to Ka, who is Kr's older sister, and Ka's friend, Margaret Dunn. Margaret was the wife of Jason Dunn, who was the pastor of the church where the lock-in was held. Ka and Margaret both reported defendant to CPS. Ka and Margaret took Kr to the hospital, where she

---

[2] See *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

disclosed the sexual abuse to medical staff and a police officer. Smith joined Kr at the hospital. At the hospital, Smith remained on the phone with defendant, who could be heard yelling and asking who told.

Kr declined a physical examination at the hospital. No physical examination was ever performed. Following Kr's assessment at the hospital, Kr was interviewed by Macomb County Sheriff's Office Commander Jason Abro, who decided to interview her instead of sending her for a forensic examination. After her interview with Commander Abro, Smith sent Kr and C to Texas for the summer. While Kr and C were in Texas, Commander Abro declined to have Kr forensically interviewed.

Smith testified at trial that she never saw defendant sexually abuse Kr. However, she recalled that defendant would make Kr and C give him massages. It bothered her that defendant forced Kr and C to kiss his hand. She recalled an instance when she found defendant and Kr in the bathroom together in the middle of the night and another instance when Kr told her that defendant asked her for a "blow job." Smith further testified that she overheard defendant ask Kr about her period once.

Ka also testified that she saw Kr and C give defendant massages. She heard defendant make sexual comments about Kr's body. Ka admitted that she did not like defendant and that she did not witness defendant sexually abuse Kr. She explained that in 2010, she reported defendant to CPS for playing a game with Kr and C in which he would kiss their necks and cheeks. Both Kr and C were forensically interviewed in 2010, but made no disclosures of sexual abuse.

Margaret and Jason Dunn testified that defendant stalked their home after Margaret contacted CPS and accompanied Kr to the hospital. Jason further explained that defendant called him and offered him money for information. William Marrow, who was defendant's friend, testified that defendant asked him to help intimidate Kr and Smith into recanting Kr's allegations. Additionally, a letter defendant wrote to his brother was admitted at trial. In the letter, defendant asked his brother to give the letter to Marrow. The letter offered Marrow $50,000 to recant or change his testimony from the first trial. Mark Morello, who was another of defendant's friends, testified that defendant called him to talk about Marrow and ask if he had any information on him.

Both Marrow and Morello testified that they saw defendant make Kr and C give him massages and kiss his ring. On one occasion, they saw defendant call downstairs for Kr to bring him a towel. Defendant did not return downstairs for approximately another half hour.

Defendant's trial strategy focused on the inconsistencies between Kr's testimony at the second trial and her disclosures and prior testimony. His strategy also focused on demonstrating that Commander Abro's investigation of Kr's disclosure was faulty and illegal and that Kr was coached by various individuals, including Ka, Margaret, and the prosecution. In his case-in-chief, defendant called Kr's younger sister, C, and her older brother, Edward. Neither of these witnesses saw defendant sexually abuse Kr. However, C testified that it was possible for defendant and Kr to be alone together. C also testified that she and Kr massaged defendant, and she saw defendant make Kr kiss his ring. Edward also saw Kr and C give defendant massages. Edward testified that he was scared of defendant.

After the parties rested their cases, a jury convicted defendant of four counts of CSC-I and acquitted him of one count of CSC-I. The count for which defendant was acquitted was one of two counts for oral penetration. He was sentenced as previously described. Following his trial, defendant moved for a new trial, or alternatively for an evidentiary hearing, asserting that he was prejudiced by the unavailability of several witnesses and impermissible credibility vouching at trial. The trial court rejected these claims. We now address these claims and several others raised in defendant's appeal as of right.

## II. UNAVAILABLE WITNESSES

Defendant first argues that he is entitled to a new trial because he was prejudiced by the prosecution's failure to make the requisite efforts to secure three witnesses: Cheryl Dunton, Debra Spork, and Lisa Montalto. Because we conclude that defendant was not prejudiced by the failure to produce these witnesses, we disagree.

We review a trial court's decision on a motion for new trial for an abuse of discretion. *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194 (2011). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). A trial court necessarily abuses its discretion when it commits an error of law. *Id*.

Under the statutory framework in MCL 767.40a, the prosecution is obligated to disclose all known res gestae witnesses,[3] update its witness list, and provide the names of witnesses who the prosecution intends to call at trial. MCL 767.40a(1)-(3). The prosecution is obligated to exercise due diligence to produce endorsed witnesses at trial. *People v Eccles*, 260 Mich App 379, 388-389; 677 NW2d 76 (2004). The prosecution no longer has an affirmative duty to call all res gestae witnesses at trial. *People v Koonce*, 466 Mich 515, 518-521; 648 NW2d 153 (2002). However, the prosecution is obligated to render "reasonable assistance" in locating and serving process upon a witness when requested in writing by defendant. *Koonce*, 466 Mich at 521; MCL 767.40a(5).

A violation of MCL 767.40a does not result in automatic reversal. Rather, if the prosecution violates MCL 767.40a by failing to make the requisite efforts to produce a witness, the trial court must determine if defendant was prejudiced by the witness's absence. *People v Pearson*, 404 Mich 698, 723; 273 NW2d 856 (1979), superseded on other grounds by MCL 767.40a; see also *People v Duenaz*, 306 Mich App 85, 104; 854 NW2d 531 (2014). As the party asserting error, defendant bears the burden of providing this Court "with a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000).

---

[3] A res gestae witness is someone who witnesses an event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts at trial. *People v Long*, 246 Mich App 582, 585; 633 NW2d 843 (2001).

All three of the missing witnesses were current or former CPS workers involved in the CPS investigation of the sexual-abuse allegations in this case. Spork was endorsed as a witness by the prosecution. Dunton and Montalto were listed as defense witnesses. On the last day of trial after the close of proofs, defendant asked the trial court to compel the prosecution to produce Spork and Dunton. The parties placed the efforts they made to produce these two witnesses on the record.[4] The trial court denied defendant's request to compel the prosecution to locate these witnesses after explaining that defendant waited until the parties had rested their cases to make this request, despite the fact that the trial had been set for several months and the trial itself had started 17 days earlier.

After his trial, defendant moved for a new trial on the basis that he was prejudiced by the prosecution's failure to make the requisite efforts to locate Dunton, Spork, and Montalto. The trial court agreed that the prosecution failed to make the requisite efforts to locate these witnesses. However, the trial court concluded that defendant was not entitled to relief because he was not prejudiced by this failure. The trial court explained that defendant had access to the CPS report drafted by Dunton and Spork at trial and he otherwise failed to establish an admissible purpose for which these witnesses would testify.

Because the trial court concluded that the prosecution did not make the requisite efforts to locate these witnesses, the focus on appeal is whether defendant was prejudiced by this failure.[5] Both appellate counsel and defendant provide arguments in support of this issue. Addressing each in turn, we conclude that defendant was not prejudiced by the failure to produce Dunton, Spork, or Montalto.

Dunton and Spork were the authors of the two CPS reports that were the subject of the *Brady* violation addressed in defendant's appeal following his first trial. *Bustinas*, unpub op at 9-12. Dunton drafted the 2010 CPS report that was prepared following Ka's September 13, 2010, complaint to CPS that she feared for her younger sister's safety. Kr and C were forensically interviewed following this complaint. According to Dunton's report, Kr stated in the forensic interview "that she likes [defendant] and denies that there is anything that she does not like about him." Kr also stated "the only person in the house that does not like [defendant] is Ka." The report further detailed that during their forensic interviews, Kr and C described a game in which defendant would kiss their cheeks and neck, but maintained that he had stopped playing this game with them two years earlier. Both Kr and C reported that they felt safe in their home. Dunton concluded the report by finding "there is not a preponderance of the evidence that there has been physical neglect or sexual abuse in the home."

Spork authored two CPS reports from 2013. The first report was the subject of defendant's first appeal. That report detailed Kr's interview with Commander Abro following her disclosure that defendant sexually abused her. According to Spork's report, Kr stated that defendant only sexually abused Kr when her mother was at work. In contrast to this report, Kr testified at the

---

[4] No record was made regarding the efforts to locate Montalto.

[5] Although our review is narrowly tailored to whether defendant was prejudiced by the failure to produce these witnesses, we question the trial court's underlying conclusion that the requisite efforts were not made to locate Dunton, Spork, and Montalto.

second trial that sometimes defendant sexually abused her while her mother was home and within sight. The report also contained a statement Commander Abro made to Spork that he decided not to do a Care House interview with Kr and would interview her himself. Additionally, the report included a statement from a Texas CPS investigator who spoke with Spork and reported that Commander Abro had vetoed a forensic interview of Kr because she had been interviewed in Michigan and Commander Abro did not want to risk any inconsistent statements. The second 2013 CPS report drafted by Spork contained a sentence summarizing previous sexual-abuse allegations in which Kr was the victim.

Montalto was a CPS supervisor who testified along with Spork at a proceeding before an administrative law judge ("ALJ") in 2018. Defendant had initiated the proceeding to expunge his name from the Central Registry for the complaint made on April 22, 2013, that defendant sexually abused Kr. The ALJ issued a decision and order explaining that Montalto, who acted as a representative on behalf of respondent Macomb County Department of Health and Human Services ("DHHS"), and Spork were the only two witnesses. The ALJ concluded that the DHHS did not establish by a preponderance of the evidence that relevant and accurate evidence of abuse or neglect existed. In support of this conclusion, the ALJ explained that Kr was interviewed by Commander Abro instead of a forensic interviewer after her disclosure. The DHHS failed to show that the manner in which Commander Abro interviewed Kr met the criteria for interviewing a child in sexual-abuse cases. The ALJ did not know if Commander Abro had any training in forensic interviewing techniques because he was not present for the hearing and documentation of the interview did not identify his qualifications or the methods used during the interview. Additionally, the ALJ did not have the opportunity to weigh the credibility of Kr's statements to Commander Abro in the interview because she did not testify at the hearing either. Accordingly, the ALJ concluded that defendant's name should be removed from the Central Registry.

First, appellate counsel argues on behalf of defendant that Spork and Dunton would have testified about Kr's statements memorialized in the CPS reports. He likewise argues that Dunton would have testified that Kr did not disclose sexual abuse in a 2010 forensic interview and that she concluded in 2010 that a preponderance of the evidence did not support a finding of sexual abuse. He asserts that this case was a "credibility contest" and these witnesses would have offered powerful impeachment testimony that the jury did not have an opportunity to hear because of their absence.

Although defendant asserts Dunton's and Spork's testimony was vital to impeach Kr, defendant fails to establish that either Dunton's or Spork's testimony would be admissible at trial for this purpose. Kr's unsworn statements memorialized in these CPS reports are hearsay and generally inadmissible as substantive evidence. See MRE 801(c);[6] *People v Jenkins*, 450 Mich 249, 260-261; 537 NW2d 828 (1995). Defendant offers no hearsay exception which would allow Dunton or Spork to testify about the statements contained in the CPS reports. The only admissible purpose of Kr's statements from the CPS reports was as extrinsic evidence of prior inconsistent

---

[6] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

statements. Before using the CPS reports for this purpose, defendant had to lay a proper foundation in accordance with the rules of evidence:

> [T]he proponent of the evidence must elicit testimony inconsistent with the prior statement, ask the witness to admit or deny making the first statement, then ask the witness to admit or deny making the later, inconsistent statement, allow the witness to explain the inconsistency, and allow the opposite party to cross-examine the witness. [*Barnett v Hidalgo*, 478 Mich 151, 165; 732 NW2d 472 (2007), citing MRE 613(b).]

Because the purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement, and not to prove the contents of that statement, the contents of the report itself would not be substantively admissible. *People v Shaw*, 315 Mich App 668, 683; 892 NW2d 15 (2016); see also MRE 613. Neither Spork nor Dunton could have testified about Kr's statements from the CPS reports. Instead, Kr was the appropriate witness to question regarding the prior inconsistent statements.

Defendant had the CPS reports at trial. Nothing prevented him from using these reports to impeach Kr with her prior inconsistent statements. In fact, defendant used the 2010 report for the express purpose of impeaching Kr at trial with prior inconsistent statements. During cross-examination, defendant asked Kr if she remembered being forensically interviewed in 2010 and telling the forensic interviewer that she liked defendant and there was nothing she did not like about him. Defendant also asked Kr if she told the forensic interviewer about the "kissy" game. Kr did not remember the interview or making these statements. After being shown the report, Kr recalled the interview and testified that she remembered being told to lie in exchange for moving into Ka's old room. As such, the jury heard the potential impeachment material that defendant asserts he required Dunton to elicit.

The remaining statement in the 2010 report that Ka was the only person in the house who did not like defendant was not elicited at trial. However, defendant had the opportunity to ask Kr about this statement and failed to do so. Regardless, multiple witnesses readily admitted that Ka did not like defendant, including Ka herself. Although defendant did not develop this testimony, the jury still heard that Ka harbored a bias against defendant and had a motive to testify against him.

It is not apparent that defendant used the 2013 CPS report to impeach Kr regarding her previous statements that the sexual abuse only occurred when no one else was home. However, defendant attempted to use a deputy's police report and Kr's testimony from previous hearings for this purpose. During cross-examination, defendant asked Kr if she told the deputy that the sexual abuse always happened when nobody was home. He likewise asked whether she indicated in her prior testimony that the sexual abuse only occurred at the trailer when no one was home. Defendant did not receive a clear answer regarding this statement because he asked the questions in a confusing and compound manner. He also did not lay the foundation to impeach her with the prior inconsistent statements. Regardless, the jury heard Kr admit that her testimony at the second trial was more detailed than her previous disclosures. Defendant's failure to further develop testimony regarding Kr's statements in the reports was not a result of either Dunton's or Spork's absence.

Relatedly, defendant argues that Dunton could have testified that the statements Kr made in the 2010 CPS report were elicited in a forensic interview and explained to the jury that forensic interviewing was designed to be an unbiased and truth-seeking process. However, Dunton is not the only witness who could have provided this testimony. Defendant could have offered an expert or another forensic interviewer to provide this exact testimony and failed to do so.

Defendant also argues that Dunton could have testified about her conclusion in the CPS report that "there is not a preponderance of the evidence that there has been physical neglect or sexual abuse in the home." Defendant offers no reason why this statement would be admissible. Generally, a witness cannot comment on or provide an opinion regarding the credibility of another witness. See *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013).

Next defendant argues that Spork could have testified about the statement in the second 2013 CPS report summarizing previous sexual-abuse allegations involving Kr and other individuals. However, this testimony is inadmissible. The trial court properly excluded this evidence under the rape-shield law before trial. See MCL 750.520j.[7]

Finally, defendant argues that Montalto and Spork could have testified that an ALJ ordered CPS to remove defendant's name from the Central Registry after a hearing. Defendant has made no effort to explain how the results of a collateral proceeding would be admissible. The proceedings before the ALJ involved a different burden of proof, limited witnesses and evidence, and collateral issues. What occurred at this proceeding was not relevant to a criminal jury trial and would only serve to confuse the jury. The ALJ expressly stated that his decision was based in part on his inability to assess the credibility of either Kr or Commander Abro, who were not present at the hearing. Likewise, the ALJ based his decision in part on his assessment of the present witnesses' credibility. It would invade the province of the jury to admit the ALJ's conclusion regarding credibility. *Musser*, 494 Mich at 348-349. Outside of the ALJ hearing, defendant has offered no other reason for which Montalto would have testified at trial.

In his Standard 4 brief, defendant raises additional arguments to support that he was prejudiced by the absence of Dunton and Spork. However, like the arguments raised by appellate counsel, the failure to produce Dunton and Spork did not prevent defendant from using the CPS reports at trial.

Defendant first argues that he was prevented from using Spork's 2013 CPS report to impeach Commander Abro. He argues that Spork would have been able to testify that Commander Abro decided against Kr being forensically interviewed by Care House in Texas because he and the prosecution did not want to risk any inconsistencies in her testimony. This was contrary to his testimony at trial that he interviewed Kr because Care House policy in 2013 permitted children age 13 or older to be interviewed by a detective. The statement contained in the 2013 CPS report was made by a CPS investigator in Texas to Spork. This statement was hearsay within hearsay. See MRE 805. Spork would not be able to testify what the CPS agent in Texas told her that Commander Abro said to him. See MRE 802. Defendant had the opportunity to use the 2013 CPS

---

[7] We further address the admissibility of this statement in Issue IV.

report to impeach Commander Abro through prior inconsistent statements. See *Shaw*, 315 Mich App at 683. He failed to do so.

Defendant also argues in his Standard 4 brief that he was prevented from cross-examining Smith with the 2013 CPS report, which contained her statement that her decision to send Kr and C to Texas was preplanned, that Smith was intimidated by CPS, that she cancelled her interview with Commander Abro because she was claustrophobic, not because she was afraid of defendant. Similar to the other arguments made by defendant and appellate counsel, these statements were hearsay and Spork would not be able to testify about them. Defendant had the opportunity to use the report when cross-examining Smith. In fact, defendant asked Smith about her reason for sending Kr and C to Texas and asked her to review the 2013 CPS Report. In response, Smith testified that she sent Kr and C to Texas on the spur of the moment and that she was afraid of defendant.

Finally, defendant argues in his Standard 4 brief that Spork would have testified that she was familiar with Care House forensic interviewing protocol in 2013 and that the protocol requires all children under the age of 18 to be forensically interviewed.[8] In support of this, defendant cites Spork's testimony from a remand hearing in 2017. He asserts that Spork testified that the forensic interviewing protocol defines a child as a person under the age of 18 and, because Kr was 13, the protocol applied to Kr. Defendant misrepresents Spork's testimony from that hearing. When questioned by defendant's appellate counsel, Spork agreed that the Model Abuse and Neglect Protocol defined children as persons 18 years or younger. However, when asked if she was aware that the model required the use of forensic interviewing protocol when interviewing a child complaining of sexual abuse, Spork answered she believed some discretion was involved. Defendant has failed to show that Spork would provide testimony in support of his defense theory. See *Elston*, 462 Mich at 762. To the extent Spork's testimony can be said to support defendant's argument that Commander Abro broke Child Protection Law, the trial court offered to have Spork's testimony from the remand hearing read into the record. Defendant declined this offer.

---

[8] Defendant continuously raised the argument that Commander Abro and the prosecution violated Child Protection Law by having Commander Abro interview Kr instead of a forensic interviewer because the Model Protocol developed by the State of Michigan Governor's Taskforce on Children's Justice required all children 18 years or younger to be interviewed by a forensic interviewer. However, it was explained at trial that the Model Protocol was a guideline rather than a mandatory directive. The protocol used in each county to interview children was established by that county's respective prosecutor. In 2013, the Macomb County Prosecutor's policy was to have children 12 years and younger interviewed by a forensic interviewer and to have children 13 years and older interviewed by a detective. This testimony is in line with Child Protection Law in 2013, which provides that the prosecutor in each county "shall adopt and implement standard child abuse and neglect investigation and interview protocols *using as a model* the protocols developed by the governor's task force . . . ." MCL 722.628(6) (emphasis added), as amended by 2008 PA 300. Regardless, defendant was free to cross-exam Commander Abro regarding his qualifications to interview child complainants and the types of questions he asked Kr in her interview.

-9-

Ultimately, nothing in the record supports that defendant was prejudiced by the absence of Dunton, Spork, or Montalto. None of these witnesses would have been permitted to testify about other witnesses' statements contained in the CPS reports. Likewise, none of these witnesses would have been able to testify about the other information contained in the CPS reports that defendant relies on or the outcome of the ALJ hearing. The only purpose asserted by defendant that these witnesses could have testified about is the protocol and purpose of forensic interviewing. However, defendant could have elicited this testimony from another forensic interviewer or an expert. The absence of these witnesses did not prevent him from offering this testimony. Defendant had access to these reports at trial and failed to effectively use them despite the *Butsinas* panel explaining the defense strategy these reports supported. *Butsinas*, unpub op at 9-12.

Kr provided descriptive and extensive testimony of defendant's guilt. The jury's acceptance of some or all of this testimony ultimately rested on her credibility. Without these witnesses, defendant still used police reports, medical charts, and previous testimony to impeach Kr on various details throughout trial. In fact, the jury heard Kr readily admit that her testimony at the second trial was far more detailed than her previous testimony and statements. Kr also testified that her statement to medical staff and police officers that she was raped daily was inaccurate. Accordingly, Kr's credibility was before the jury. It was up to the jury to consider whether Kr did not disclose sexual abuse in the 2010 forensic interview because it did not occur or because she was told to lie. It was also up to the jury to consider whether Kr's far more detailed testimony at the second trial was credible. The jury's acquittal of one of the counts of CSC-I for oral penetration supports that the jury paid close attention to these inconsistencies.

Moreover, other evidence supported defendant's guilt. Kr's recitation of events was corroborated by multiple witnesses who saw Kr give defendant massages and kiss his hand. Several witnesses also heard defendant make sexual comments about Kr's body. Smith's testimony corroborated several events, including the "blow job" request and question about her period, that Kr described at trial. Additionally, defendant's guilt was supported by his actions toward the Dunns to intimidate Margaret from testifying against him after Margaret reported defendant to CPS, his plan with Marrow to prevent several witnesses from testifying at trial, and his offer to pay Marrow to change his testimony at the second trial. Defendant has failed to show he was prejudiced by the failure to produce Dunton, Spork, and Montalto.

## III. CREDIBILITY VOUCHING

Next, defendant argues that four witnesses impermissibly vouched for Kr's credibility. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Before addressing the merits of this issue, we address the parties' disagreement whether defendant preserved this evidentiary issue by raising it for the first time in a postjudgment motion for a new trial. We hold that a party asserting evidentiary error who fails to object at a time that gives the trial court the opportunity to correct the error does not preserve that evidentiary error by raising it for the first time in a postjudgment motion for a new trial.

-10-

Generally, "[t]o preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019); *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001); MRE 103(a). For an objection to be timely it must be contemporaneous with the error to provide the trial court "an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights." *People v Carines*, 460 Mich 750, 765; 597 NW2d 130 (1999) (quotation marks and citation omitted). This requirement encourages the litigants "to seek a fair and accurate trial the first time around . . . ." *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006) (quotation marks and citation omitted).

Defendant relies on a recent unpublished opinion of a panel of this Court to support that he preserved this issue by raising it for the first time in a postjudgment motion for new trial. In *People v Fedewa*, unpublished per curiam opinion of the Court of Appeals, issued April 18, 2024 (Docket No. 362396), p 3, an expert testified regarding the applicability of the child-sexual abuse accommodation-syndrome factors to a complainant's testimony without objection at trial. Although the defendant did not raise the issue during the trial, a panel of this Court treated the issue as preserved because the defendant raised the admissibility of the testimony in a postjudgment motion for new trial. *Id*. at 3 n 6. The panel explained that other panels had treated claims of instructional error as preserved in similar circumstances. *Id*. The panel quoted the following language from *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997): "The purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." *Fedewa*, unpub op at 3 n 6. According to the panel, this purpose was fulfilled in that case because the defendant "made the same arguments in the trial court that he makes on appeal regarding [the] expert testimony, and the trial court had an opportunity to hear and rule on those arguments. Therefore, appellate counsel has done what they can in the trial court." *Id*.

Unpublished opinions are not binding on this Court but may be persuasive. MCR 7.215(C)(1); *People v Kloosterman*, 296 Mich App 636, 641 n 2; 823 NW2d 134 (2012). We are not persuaded by the *Fedewa* panel's analysis.[9] Rather, we think defendant and the panel misapprehend this Court's analysis in *Mayfield*. The quoted language in *Mayfield* arises in the context of a defendant's appellate argument that the trial court should have severed his felon-in-possession-of-a-firearm charge from his remaining charges. 221 Mich App at 658. In the analysis surrounding the quoted language, this Court made clear that the purpose of the preservation requirement is to raise the issue at a time when the error can be avoided or its prejudice alleviated:

> Applying the [*United States v Mebust*, 857 F Supp 609, 612-613 (ND Ill, 1994)] considerations in the present context, it becomes apparent that defendant failed to take any action to minimize the potential for prejudice in the prosecutions

---

[9] Defendant relies on two other unpublished opinions of panels of this Court. See *People v Carter*, unpublished per curiam opinion of the Court of Appeals, issued November 19, 2020 (Docket No. 340645); *People v Noom*, unpublished per curiam opinion of the Court of Appeals, issued May 11, 2023 (Docket No. 362414). We conclude that neither of these cases are persuasive.

below. Defendant did not move to sever the prosecutions, failing even to offer any type of objection below, which is to say, defendant has failed to preserve this issue. The purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice. While all of the prophylactic measures described in *Mebust* were available to defendant, he availed himself of none. [*Mayfield*, 221 Mich App at 660.]

With this analysis in mind, we conclude that permitting a party to raise an evidentiary issue for the first time in a postjudgment motion for new trial, whether in this Court or in the trial court, controverts the purpose of the preservation requirement because the opportunity for the trial court to correct the error and its prejudice has passed. We hold that making such a posttrial motion does not preserve the issue sought to be raised in the same manner a timely motion or objection during trial would have, so review of the unpreserved issue is for plain error affecting substantial rights.

In this case, defendant did not make a contemporaneous objection to any of the evidence alleged to bolster Kr's credibility at trial. Instead, he waited until after a verdict was rendered against him to raise this issue, preventing either party from contemporaneously addressing the alleged error before the trial court. This also prevented the trial court the opportunity to correct the alleged error or alleviate any prejudice before the jury rendered its verdict. Accordingly, defendant did not preserve his argument that the trial court erred by admitting the evidence alleged to vouch for Kr's veracity.

Because this issue is unpreserved, we review for plain error affecting substantial rights. *People v Fackelman*, 489 Mich 515, 537; 802 NW2d 552 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. If these three requirements are satisfied, reversal is only warranted when the error resulted in the conviction of an actually innocent defendant or error that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id*. at 763 (quotation marks and citation omitted; alteration in original).

## B. ANALYSIS

Turning back to the merits of this issue, defendant argues that Commander Abro, psychiatric social worker Sonia Shamoon, pediatric Nurse Practitioner ("NP") Karen Watson, and Dr. Berishaj impermissibly commented on Kr's credibility. Addressing each in turn, we disagree.

Generally, it is the province of the jury to determine the credibility of the witnesses before it. *Musser*, 494 Mich at 348-349. Consequently, "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *Id*. at 349. A witness's commentary regarding the credibility of another witness has no probative value because it does nothing to assist the jury in determining a witness's credibility in relation to its fact-finding mission and its ultimate assessment of guilt. *Id*. In cases involving allegations of CSC made by children, our Supreme Court has held: "(1) an expert may not testify that the sexual

abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995), amended 450 Mich 1212 (1995).

Previously, our Supreme Court has concluded that an expert's testimony amounted to vouching for a complainant's credibility by asserting "that only 2% to 4% of children lie about sexual abuse." *Thorpe*, 504 Mich at 259. The expert also identified two circumstances in which a child "might lie" about sexual abuse, but concluded that neither applied in that case. *Id*. The Court reasoned that this testimony amounted to vouching: "although he did not actually say it, one might reasonably conclude on the basis of [the expert's] testimony that there was a 0% chance [the complainant] had lied about sexual abuse." *Id*. The Court followed its decision in *Peterson*, where one expert similarly testified that "children lie about sexual abuse at a rate of about two percent," and another expert testified, of the cases and studies he was familiar with, "there is about an eighty-five percent rate of veracity among child abuse victims." 450 Mich at 355, 356. In *Peterson*, the Court explained that neither expert explicitly opined that a child complainant was being truthful; however, there was a risk in cases that amount to "credibility contests" that the jury would seek "to hang its hat on the testimony of witnesses it views as impartial." *Id*. at 376 (quotation marks and citation omitted).

Nothing similar to any of these examples took place in this case.

Instead, defendant first argues that Commander Abro improperly bolstered Kr's credibility by describing the actions he took to investigate her disclosure. He asserts that reference to Commander Abro's investigation implied to the jury that Commander Abro and the prosecution believed Kr's allegations. Otherwise, defendant would not have been charged and on trial. Defendant asserts that this testimony, contextualized by his position as a law enforcement professional, made Commander Abro a "human lie-detector."

Defendant does not cite any specific testimony to support this contention. Defendant cites a recent concurrence in *People v Dunifin*, unpublished per curiam opinion of the Court of Appeals, issued July 20, 2023 (Docket No. 358070), lv den 513 Mich 1106 (2024) (SHAPIRO, J., concurring), to ask this Court to use the logic behind the prohibition on witnesses commenting on another witness's credibility to uniformly bar testimony regarding investigative procedure. The *Dunifin* concurrence analogized testimony about a forensic interview being like testimony about a lie detector and that since lie detector evidence is barred, so too should testimony about a forensic interview. This position was not accepted by the majority in *Dunifin* nor has it been by any Michigan appellate court.

Frequently, the process and protocol by which a complainant was interviewed will be directly relevant to an issue in dispute. In *People v Tolen*, unpublished per curiam opinion of the Court of Appeals, issued June 20, 2024 (Docket Nos. 364170 and 364171) p 8, a panel of this Court wrote:

> [E]xpert testimony about the forensic interview process was relevant. MRE 401. Untrained laypeople lack direct knowledge of forensic interview protocols and how improper interviewing techniques can taint a child interviewee's allegations. Likewise, explanation of the protocol bears on issues regarding accuracy and validity. See [*People v*

*Trakhtenberg*, 493 Mich 38, 54-55; 826 NW2d 136 (2012)]. In this case, defendant asserted that [the complainant] was manipulated into making allegations against defendant and that the investigation of [the complainant's] allegations was biased and cursory. Accordingly, the admission of the testimony regarding proper interviewing protocols was relevant because it would "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." MRE 702.

Likewise, a common defense strategy in cases of child-sexual abuse lies in criticizing the investigation of the complainant's allegations. In such a case, testimony regarding the protocol of forensic interviewing or the investigation would be directly relevant to rebut that defense strategy. See MRE 401.

We disagree with the position that evidence regarding the protocol of forensic interviewing (or investigative procedure in this case) should be categorically inadmissible. We hold the relevance of this testimony should continue to be examined on a case-by-case basis.

Regarding Commander Abro's testimony, the record does not support that he impermissibly vouched for Kr's credibility. Commander Abro testified that he interviewed Kr, interviewed other witnesses, attempted to get a search warrant, compiled a report, and presented that report to the prosecutor. He testified that he asked open-ended questions when he interviewed Kr. Commander Abro did not comment on the actual statements made by Kr during the interview until cross-examination.[10] He admitted that the statements Kr made in her interview were different from those she made at the second trial. Nowhere in this testimony did Commander Abro offer an opinion that sexual abuse occurred or that Kr was being truthful. Rather, Commander Abro's testimony was relevant to rebut the defense theory in this case, which included that Commander Abro's investigation was faulty or illegal. Commander Abro's testimony explaining his investigative process was relevant for the jury to assess the sufficiency of Commander Abro's investigation and to contextualize Kr's allegations in light of that investigation. Commander Abro did not make himself out to be a "human lie detector" in front of the jury.

Next, defendant asserts three medical professionals vouched for Kr's credibility. Notably, defendant contends that each of the medical professionals vouched for Kr in an expert capacity. However, only one of the three medical professionals was qualified as an expert in this case. That expert was Dr. Berishaj, who testified as an expert in Sexual Assault Nurse Examiner ("SANE") nursing. She explained the protocol of SANE examinations, that such examinations are voluntary, and that an examination will be conducted if the assault was alleged to have occurred within 72

---

[10] Commander Abro did not testify regarding the details of Kr's allegations during direct examination. The only instance in which Commander Abro discussed the details of Kr's allegations from his interview was during cross-examination when defendant elicited this testimony to show inconsistencies between her testimony at the second trial and the police interview. Defendant cannot complain about testimony he expressly invited. See *People v McPherson*, 263 Mich App 124, 139; 687 NW2d 370 (2004) ("Under the doctrine of invited error, a party waives the right to seek appellate review when the party's own conduct directly causes the error.").

hours of the examination. Dr. Berishaj also explained the anatomy of female genitalia and the likelihood of finding injury to the genitalia from penetration.

Defendant takes issue with this testimony because a SANE examination did not take place in this case. Defendant asserts that Dr. Berishaj's testimony had no probative value other than bolstering the prosecution's case. This argument ignores that a part of the defense theory was that the prosecution violated Child Protection Law by not forcing Kr to undergo a SANE examination after she declined one. Accordingly, Dr. Berishaj's testimony regarding SANE examinations was relevant to explain that SANE examinations are not mandatory, they require the assent of the patient, and that such an examination may not have demonstrated physical injury given the time between the penetrations and disclosure. Moreover, defendant does not contend that Dr. Berishaj commented on Kr's credibility at any point. Rather, her testimony made clear that she never examined Kr nor spoke with her. Dr. Berishaj offered no opinion as to whether Kr was sexually assaulted or whether she was truthful. Dr. Berishaj's testimony did not invade the jury's province in determining whether a sexual assault occurred.

For the two remaining witnesses, as previously stated, neither Shamoon nor NP Watson testified as experts. Regardless, these witnesses were medical professionals and it is possible that the jury could consider them to be more objective sources than other lay witnesses given their training and relatively limited interaction with the parties in this case. Defendant relies on *People v Douglas*, 496 Mich 557, 570; 852 NW2d 587 (2014), in which a forensic interviewer and CPS investigator each testified that a child complainant was not coached and that the complainant "was being truthful with [her] during the interview," or that the complainant's "allegations had been substantiated." (alterations in original). The Supreme Court explained that this testimony amounted to improper vouching because the two witnesses "directly and conclusively opined that [the complainant's] allegations in the instant case were true and trustworthy." *Id*. at 583 n 8.

This Court has since distinguished between the impermissible testimony in *Douglas* and testimony from a police officer that "there was no indication that the victim had been coached." *People v Sardy*, 313 Mich App 679, 721-722; 884 NW2d 808 (2015), vacated in part on other grounds by 500 Mich 887 (2016). Before indicating that there were no signs the child complainant was coached, the police officer explained the methods used in forensic interviews to attempt to determine whether a complainant had been subjected to coaching. *Id*. at 721. The officer also noted the signs that suggest a child had been coached. *Id*. This Court explained:

> In our view, giving an opinion that there was no indication that a child CSC victim was coached based on forensic-interview training, experience, education, and the totality of the circumstances, MRE 702 and MRE 703, is not the equivalent of opining that the victim was credible or telling the truth. Indeed, we believe that there is also a distinction between testifying that a child victim had not been coached, like the definitive conclusion made by the forensic interviewer in *Douglas*, 496 Mich at 570, 583, 852 NW2d 587, and testifying that there is no indication that a child victim was coached, as opined by the officer in this case. Additionally, defendant opened the door to the question whether there was any indication of coaching. [*Sardy*, 313 Mich App at 723 (emphasis omitted).]

Additionally, this Court concluded that even if the police officer's testimony regarding coaching was improper, the remainder of his testimony regarding the protocol of forensic interviewing was proper. *Id*.

In this case, defendant asserts Social Worker Shamoon and pediatric NP Watson vouched for Kr by opining that she was not coached. The record does not support this. Shamoon testified about her assessment of Kr for psychiatric care. She testified that during her examination of Kr, she did not see anyone tell Kr what to say or how to answer her questions. This is a far cry from the testimony in *Douglas* that no coaching occurred. Testifying that she did not personally see anyone coach Kr during her assessment is distinct from generally opining that no one coached Kr.

Defendant also takes issue with Shamoon's testimony relaying Kr's statements[11] and describing the actions she took after assessing Kr, which included explaining that she changed Kr's medical team from "green" to "red," because Kr, who was experiencing suicidal ideation, required "more care" and a "more sophisticated social work team." As a mandatory reporter, Shamoon also reported Kr's case to CPS. Shamoon did not at any point in her testimony opine that Kr was credible. General testimony about the steps she took after psychologically assessing Kr says nothing about the veracity of Kr's allegations.

Similar to Shamoon, NP Watson testified that when she examined Kr at the hospital, she did not observe either Ka or Smith attempting to influence Kr's answers. NP Watson only expressed that she personally did not witness anyone coaching Kr. Again, this testimony is distinguishable from *Douglas*. Moreover, NP Watson expressly testified that she "can't say one way or another" whether Kr was sexually abused when asked by defendant during cross-examination.

Defendant also asserts that NP Watson vouched for Kr's credibility by relaying Kr's allegations to the jury and opining that Kr was a "credible narrator" of her history.[12] Defendant takes NP Watson's testimony out of context. NP Watson called Kr a "credible narrator" in response to a question of who NP Watson considered to be the best source of gathering her medical history. NP Watson explained that at Kr's age she was able to relay information about herself to a medical provider as opposed to relying on a parent to provide this information. Watson did indicate at one point that the statements Kr made to her were "verbatim" in the medical chart. She explained that the value of directly quoting the patient in the medical chart was to "validate[] exactly what was said." This testimony was in response to the question of whether NP Watson ever told Kr what to say or how to say it. NP Watson did not testify that Kr was a victim of sexual assault or that she was being truthful.

---

[11] In Issue VI, defendant challenges the admissibility of the statements Kr made to Shamoon during her assessment. In that issue, we conclude defendant waived any objection to admission of Kr's statements through Shamoon and those statements were admissible as statements made for purposes of medical treatment or diagnosis. See MRE 803(4).

[12] Kr's statements during NP Watson's examination were admissible as statements made for purposes of medical treatment or diagnosis. See MRE 803(4).

Ultimately, defendant failed to show that any of the four witnesses used their specialized training and experience to improperly comment on Kr's credibility. The jury was not given an objective source to "hang its hat" on when determining the ultimate issue of whether sexual abuse occurred in this case. Accordingly, defendant has failed to establish plain error.

IV. *IN CAMERA* HEARING

Defendant argues the trial court abused its discretion by excluding evidence that Kr was motivated to make a false allegation against defendant and had a history of making false sexual-abuse allegations without conducting an *in camera* hearing. Because we conclude defendant failed to make a sufficient offer of proof to entitle him to an *in camera* hearing, we disagree.

This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *People v Bragg*, 296 Mich App 433, 445; 824 NW2d 170 (2012). "[A] trial court's construction of a statute, such as the rape-shield statute, and interpretation of constitutional issues, such as the right to confrontation, are questions of law that are reviewed de novo." *People v Butler*, 513 Mich 24, 29; 6 NW3d 54 (2024).

Michigan's rape-shield statute, MCL 750.520j; and its parallel evidentiary rule in MRE 404(a)(3) "constitute a policy determination, that sexual conduct or reputation as evidence of character and for impeachment, while perhaps logically relevant, is not legally relevant." *People v Hackett*, 421 Mich 338, 346; 365 NW2d 120 (1984). The rape-shield statute generally precludes "evidence of a rape victim's prior sexual conduct with others, and sexual reputation, when offered to prove that the conduct at issue was consensual or for general impeachment . . . ." *Id*. at 347-348. This is subject to limited exceptions where "such evidence may not only be relevant, but its admission may be required to preserve a defendant's constitutional right to confrontation." *Id*. at 348. As relevant to this case, this includes when the evidence is offered to demonstrate ulterior motive for making false allegations or showing a history of making false allegations. *Id*. at 348-349. "The determination of admissibility is entrusted to the sound discretion of the trial court." *Id*. at 349. When a trial court is exercising its discretion, it "should be mindful of the significant legislative purposes underlying the rape-shield statute and should always favor exclusion of evidence of a complainant's sexual conduct where its exclusion would not unconstitutionally abridge the defendant's right to confrontation." *Id*.

Predicate to the admissibility determination, a defendant is obligated to make an offer of proof and demonstrate the relevance of the proposed evidence to the purpose for which it is sought to be admitted. *Butler*, 513 Mich at 30. In evaluating a defendant's offer of proof, the trial court has the responsibility to guard against "fishing expeditions." *Id*. at 31. "There must be a showing of at least some apparently credible and potentially admissible evidence that the prior allegation was false." *Id*., citing *People v Williams*, 191 Mich App 269, 273-274; 477 NW2d 877 (1991) (holding that the defendant's offer of proof was insufficient because "defense counsel had no idea whether the prior accusation was true or false and no basis for believing that the prior accusation was false . . . [and] merely wished to engage in a fishing expedition in hopes of being able to uncover some basis for arguing that the prior accusation was false"). If a defendant makes this showing, the trial court must conduct an *in camera* hearing. *Butler*, 513 Mich at 32.

In *Butler*, a defendant accused of sexual assault maintained that an encounter with the complainant was consensual. *Id*. at 27. The defendant sought admission of evidence regarding a previous sexual-assault allegation made by the complainant against two individuals. *Id*. The defendant claimed the previous allegation was false and, consequently, admissible at trial. *Id*. In his offer of proof, the defendant provided statements by the accused individuals, in which they described the details of the sexual encounter and asserted that it was consensual. *Id*. at 28. Following a police investigation, the accused individuals were not charged with a crime. *Id*. Our Supreme Court concluded that this was a sufficient offer of proof such that the defendant was entitled to an *in camera* hearing. *Id*. at 32.

In this case, defendant argues he made a sufficient offer of proof to entitle him to an *in camera* hearing. Defendant relied on one sentence from a 2013 CPS report. The sentence states, "Dr. Ryan was also informed of [Kr's] past allegations that she was sexually abused by her [natural father], a female relative, two boys in foster care settings, and the current sexual-abuse allegation with [defendant]." Defendant asserts that he was entitled to an *in camera* hearing because he informed the trial court of the previous allegations and the prosecution did not dispute those allegations existed.

Defendant did not make a sufficient offer of proof to entitle him to an *in camera* hearing. Under *Butler*, 513 Mich at 31, he had to make "a showing of at least some apparently credible and potentially admissible evidence that the prior allegation was false." The single statement in the CPS report merely supports that previous allegations of sexual abuse in which Kr was alleged to be the victim existed. The statement says nothing about the veracity of those allegations. Nothing else in the record indicates that the previous allegations were false.[13] The fact that Kr may have been sexually abused before was not relevant to an argument that Kr had a motive to lie against defendant or had a history of making false allegations. Without more, the statement from the CPS report was not a sufficient offer of proof to necessitate an *in camera* hearing.

Defendant seemingly asserts that the *in camera* hearing would be the opportunity for the trial court to find evidence that the allegations were false. However, this would equate with the "fishing expedition" that is warned against in *Butler*, 513 Mich at 31, and *Williams*, 191 Mich App at 273-274. Defendant further asserts that the parties could have secured other witnesses or documentary evidence in support of admission. Defendant bore that burden of providing a sufficient offer of proof in the trial court and he did not do so. It is of no consequence that defendant asserts on appeal he could have provided additional documentation for his offer of proof.

---

[13] In fact, the only other record evidence related to the previous sexual assault allegations was a 2007 CPS report that indicates that Kr's step mother, and not Kr, made the allegation against Kr's natural father. There is no other record evidence addressing the context of the allegations involving the foster boys or female relative.

Therefore, the trial court did not abuse its discretion by declining to conduct an *in camera* hearing on the admissibility of the evidence.[14]

## V.  OTHER-ACTS EVIDENCE

Defendant next argues that the trial court erred by admitting several categories of unduly prejudicial other-acts evidence: (1) evidence that defendant attempted to bribe or intimidate witnesses; (2) sexual comments defendant made about Kr's body; (3) threats defendant made to Kr about herself and her family; (4) testimony indicating that defendant had a volatile, abusive relationship with Smith; (5) reference to defendant's drug use; (6) reference to defendant hiring sex workers; (7) reference to defendant's time in jail; and (8) reference to defendant's time in prison.  We ultimately disagree with defendant.  However, before addressing the merits of his argument, we note that defendant's waiver of admission of some of the other-acts evidence, in addition to his failure to cite the lower court record to support his argument on appeal, makes review of this issue difficult.

### A.  PRESERVATION, WAIVER, AND ABANDONMENT

As previously stated, "[t]o preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."  *Aldrich*, 246 Mich App at 113.  Defendant contends that he preserved objections to the first four categories of other-acts evidence when the prosecution sought their admission before trial.  Indeed, defendant preserved a portion of this issue by objecting in writing to two of these categories: the evidence of witness intimidation specific to Jason Dunn and evidence of defendant's volatile relationship with Smith.  However, in the same brief in opposition, defendant stated he "is not necessarily going to oppose the proffered evidence or testimony of Margaret Dunn regarding witness intimidation, alleged evidence that he threatened [Kr] if she disclosed the purported abuse, and the accusations that [defendant] made sexual and inappropriate comments about [Kr's] body."  Instead, defendant asserted that he will address and discredit that evidence at trial.  Consequently, the trial court admitted this evidence without substantive analysis.

Not only are these issues unpreserved, they are waived.  Waiver is the "intentional relinquishment or abandonment of a known right."  *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted).  Waiver is distinct from forfeiture where a party merely fails to make a timely assertion of a right.  *Id*.  "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error."  *Id*. (quotation marks and citation omitted).  Because defendant affirmatively conceded admission of these categories of evidence in the trial court, his allegation of error on appeal that this evidence is inadmissible under MRE 404(b) is waived, extinguishing any error.  See *id*.

---

[14] Defendant argues that he should not be required to prove the falsity of the allegations on remand. This Court need not address the burden of proof applicable for ultimate admissibility of the evidence because defendant is not entitled to remand.  See *Butler*, 513 Mich at 34.

Defendant concedes that he did not object to the four remaining categories of other-acts evidence in the lower court proceedings. It is not abundantly clear where in the lower court record this evidence was elicited. Defendant does not cite the location of this evidence in the lower court record in his supplemental briefing where he raises this issue. However, in the original brief filed by appellate counsel, defendant provides citations for instances of other-acts evidence in his Statement of Facts. This Court is left guessing at the factual predicate of defendant's claim. Presumably, the citations defendant provided in his Statement of Facts are the locations of the contested evidence.

Because defendant did not object to any of the testimony contained in his Statement of Facts, this issue is not preserved in relation to the four remaining categories of other-acts evidence. See *Aldrich*, 246 Mich App at 113. Moreover, defendant has abandoned this issue by leaving this Court to scour the lower court record for evidence in support of his argument. See *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) ("Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position.") (quotation marks and citation omitted).

## B. STANDARD OF REVIEW

We review the preserved portion of defendant's argument for an abuse of discretion. *Bragg*, 296 Mich App at 445. We review preliminary questions of law regarding the admissibility of evidence de novo. *Duenaz*, 306 Mich App at 90. A preserved nonconstitutional error "is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (quotation marks and citation omitted).[15] The unpreserved portions of this argument are reviewed for plain error affecting substantial rights. *Fackelman*, 489 Mich at 537.

## C. ANALYSIS

Other-acts evidence "is not admissible to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1). However, such evidence may be admissible for another purpose. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). A nonexhaustive list of proper purposes for the admission of other-acts evidence is set forth in MRE 404(b)(1):

> It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material,

---

[15] Without meaningful analysis, defendant requests that this Court revisit *Lukity*. This Court "is bound by stare decisis to follow the decisions of our Supreme Court." *People v Robar*, 321 Mich App 106, 117; 910 NW2d 328 (2017) (quotation marks and citation omitted). *Lukity* is an opinion of the Michigan Supreme Court that has not been overruled or superseded. This Court is bound to follow Supreme Court precedent by applying harmless error review to the issue. Regardless, we need not reach this issue because we conclude no evidence was erroneously admitted under MRE 404(b).

whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [MRE 404(b)(1).]

MRE 404(b) is a rule of inclusion rather than exclusion. *People v VanderVliet*, 444 Mich 52, 64-65; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). Accordingly, relevant evidence of other acts does not violate MRE 404(b) "unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith." *Id*. at 65.

In *VanderVliet*, our Supreme Court adopted the approach to assessing the relevancy of other-acts evidence enunciated by the United States Supreme Court in *Huddleston v United States*, 485 US 681, 691-692; 108 S Ct 1496; 99 L Ed 2d 771 (1988):

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*VanderVliet*, 444 Mich at 55.]

Defendant concedes the relevance of the evidence and asserts only that the trial court erred under the third requirement by weighing the probative value of the evidence in favor of admission. Defendant takes a sweeping approach to both the preserved and unpreserved categories of other-acts evidence, arguing that they were collectively prejudicial. He argues this case was a "credibility contest" between him and Kr and the quantity of other-acts evidence made any probative value outweighed by its collective prejudicial effect.

Review of this issue is difficult for several reasons. As previously explained, defendant waived review of a significant portion of this issue and left this Court to search the record for the instances in which other-acts evidence was elicited. An additional issue for the unpreserved categories of other-acts evidence is that much of this evidence was inadvertently admitted through nonresponsive testimony or testimony intentionally elicited by defendant.

Evidence of defendant's drug use and hiring of sex workers came into evidence inadvertently through nonresponsive answers to otherwise permissible questions. Marrow answered "drugs and girls" when asked by the prosecution why he went to defendant's house, and what he talked to defendant about on the phone. The surrounding context of these questions demonstrates that the prosecution was establishing Marrow's personal knowledge of defendant's interactions with Kr and Marrow's own relationship with defendant. Although these questions were broad, neither question can be fairly said to purposefully elicit testimony of drug use or prostitution. "A voluntary and unresponsive statement does not ordinarily constitute error." *People v Kelsey*, 303 Mich 715, 717; 7 NW2d 120 (1942); see also *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995).

Brief mention of defendant's drug use was also made in a letter that was admitted to show defendant attempted to bribe Marrow into changing or recanting his testimony. However, when defendant was asked if he objected to admission of this letter, defendant stated, "[N]o objection whatsoever" and "I want that letter admitted." Defendant waived any error arising from reference to defendant's drug use in the letter. *Carter*, 462 Mich at 215.

The other reference to defendant's drug use identified by defendant was testimony purposefully elicited by defendant when cross-examining Morello. Defendant himself asked Morello "we were using a lot of drugs at that time?" on cross-examination. Having purposefully invited this testimony, defendant cannot assert a claim of error on appeal for it. See *McPherson*, 263 Mich App at 139.

Likewise, several instances of discussion of defendant's time in prison and jail were inadvertent or invited by defendant. The prosecution asked Morello if defendant contacted him about William Marrow in 2015. Morello answered: "Vaguely, yeah. I mean, probably 20, 30 times we probably talked when – [defendant] would call me often from prison." This answer was nonresponsive, and the prosecution immediately moved on to another topic. In another instance, defendant referred to his time in jail when questioning Commander Abro. He asked Commander Abro if his bond was already revoked when Commander Abro interviewed Smith. The jury was later advised that the parties' questions to the witnesses do not constitute evidence.

Finally, when questioning Smith, the prosecution asked Smith why she waited months after Kr's initial disclosure and interview to contact the police and sit for her own interview. In response, Smith testified that she had more confidence. When asked to elaborate, Smith explained that defendant was in jail and could not get to her at the time she sat for an interview with Commander Abro. Smith's answer was nonresponsive. Following this answer, the prosecution immediately moved on to a new topic.

Outside of the instances of inadvertent and invited testimony, two references to prison were purposefully elicited by the prosecution to lay the foundation for two exhibits. First, Michigan Department of Corrections ("MDOC") employee Khris Nevins testified that he intercepted an outgoing letter from defendant in the MDOC mail. Nevins identified the letter as belonging to defendant by noting that defendant's name and inmate identification number were on the letter. The letter, which was read into the record, showed that defendant attempted to bribe Marrow into changing or recanting his testimony The prosecution elicited testimony that defendant was incarcerated to authenticate the letter and move for its admission.

Second, MDOC employee Eric Herbert testified that he was the chief security officer for the MDOC facility and that he maintained records of all calls made to and from inmates. Herbert identified defendant by his inmate number to authenticate defendant's phone records from the MDOC facility. This testimony was necessary to lay a foundation for admission of defendant's call logs from prison. In both of these instances, the testimony was brief and did not provide any additional detail regarding defendant's incarceration.

Review of the cited instances in which drug use, prostitution, jail, and prison are mentioned shows that when introduced during the prosecution's examination of witnesses, the references were brief and isolated. No testimony was offered elaborating on any of these topics. Instead, the prosecution quickly moved on to different topics.

It is also relevant to note, when evaluating this issue, it was defendant's trial strategy to inform the jury of his incarceration and drug use at several points in the proceedings below. However, even with defendant's intentional references, the testimony on these topics remained minimal and vague.

In addition to evaluating each claim individually, defendant asks this Court to consider whether the quantity of the other-acts evidence was unfairly prejudicial. However, as previously mentioned, defendant waived review of several of the categories of evidence he raises on appeal, including Margaret Dunn's testimony regarding witness intimidation, evidence that defendant threatened Kr, and evidence of sexual comments defendant made toward Kr. This leaves this Court to review evidence of defendant's volatile relationship with Smith, as well as the other witnesses' testimony regarding witness intimidation and bribing.

Returning to the *VanderVliet* analysis, logically relevant other-acts evidence is subject to exclusion if its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." *People v Jackson*, 498 Mich 246, 260; 869 NW2d 253 (2015), quoting MRE 403. All relevant evidence is prejudicial to some degree. *People v Spaulding*, 332 Mich App 638, 650; 957 NW2d 843 (2020). Evidence is considered unfairly prejudicial when there is a risk that marginally probative evidence will be given undue or preemptive weight by the jury. *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011).

The jury heard that defendant and Smith had a volatile relationship. Smith testified that she was afraid of defendant during their relationship. However, Smith clarified that defendant never touched her. This testimony was relevant to contextualize Smith's behavior and response to her daughter's disclosure of sexual abuse. Following Kr's disclosure in April 2013, Commander Abro attempted to interview Smith. Smith did not contact Commander Abro for this interview until December 2013. Her fear of defendant contextualized her delay in participating in the investigation of the sexual-abuse allegations.

The jury also heard that in the immediate aftermath of Kr's disclosure, defendant offered Jason Dunn money for information and showed up to his house to intimidate his family. Further, defendant attempted to use Marrow to intimidate Kr and her family to recant her allegations and, in the years after the first trial, defendant attempted to bribe Marrow to recant his testimony. "Evidence that a defendant made efforts to influence an adverse witness is relevant if it shows consciousness of guilt." *People v Shaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010). Evidence that defendant attempted to make witnesses change their testimony through bribing and intimidation was highly probative of a consciousness of guilt.

Collectively, the prejudice of this evidence did not substantially outweigh its probative value. As noted by defendant, credibility was a central issue at trial. There was no direct evidence of sexual abuse. Evidence contextualizing the investigation of Kr's disclosure and defendant's conduct in the aftermath of Kr's disclosure was highly probative of defendant's guilt. The less probative evidence, such as the references to drug use, prostitution, and incarceration was brief and vague, diminishing its prejudice. Moreover, any danger of unfair prejudice was alleviated by the trial court's instruction to the jury that other-acts evidence must be considered only for proper purposes. Ultimately, nothing in the record suggests that the evidence was given undue or preemptive weight by the jury.

Rather, the fact that the jury acquitted defendant of one count of CSC-I for penile-oral penetration shows that the jury paid careful attention to the issue of Kr's credibility in its ultimate determination of guilt. Defendant is not entitled to a new trial because of the admission of other-acts evidence.

## VI. HEARSAY STATEMENTS

Defendant next argues that the trial court plainly erred by admitting hearsay statements made by psychiatric social worker Sonia Shamoon who performed a psychiatric assessment of Kr in the emergency room following Kr's disclosure. This issue is waived. However, if we were to review this issue, we would conclude that the trial court did not plainly err because Shamoon's testimony was admissible under MRE 803(4).

Typically, this Court reviews a trial court's admission of evidence for an abuse of discretion. *Bragg*, 296 Mich App at 445. However, defendant not only failed to object to admission of Shamoon's testimony at trial, but affirmatively argued in support of its admission under MRE 803(4). During direct examination of Shamoon, defendant objected only to ask which hearsay exception was applicable to Shamoon's testimony regarding the statements Kr made in the examination:

> [*Defendant*]: Objection, Your honor. I have a – if she is going to use this hearsay – is she utilizing the hearsay exception for medical treatment? If so, that would – I would like to know so that the defense would be utilizing that same exception.

> [*The Prosecution*]: 803(4), Your Honor.

Following this exchange, defendant cross-examined Shamoon and asked her to read Kr's statements as memorialized in the medical chart. The prosecution objected to defendant eliciting statements Kr made from the medical chart as inadmissible hearsay that does not fall under MRE 803(4). Defendant answered as follows:

> Your Honor, anything that [Kr] said during this is under the – is for treatment medical – is for medical care treatment. That disclosure, this was for psychological, for her psychological health. This disclosure, Your Honor, during that, is pertinent to what she told this to know [Kr's] psychological state of mind at that time.

As previously stated, waiver is the "intentional relinquishment or abandonment of a known right." *Carter*, 462 Mich at 215. A defendant who waives a right may not then seek appellate review of the claimed deprivation of that right because his waiver has extinguished any error. *Id*. By affirmatively arguing for admission of all the statements Kr made to Shamoon during the psychiatric examination under MRE 803(4), he has waived the right to challenge their admissibility on appeal.[16] Assuming that we were to conclude that defendant did not waive this issue, he failed to object to admission of the evidence at trial. *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019). Accordingly, we would review defendant's unpreserved claims of

---

[16] The fact that defendant represented himself does not excuse his waiver. Defendants who self-represent are held to the same standards as a member of the bar. *People v Thurmond*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 361302); slip op at 12.

evidentiary error for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764; see also MRE 103(d).

Even if we were to overlook defendant's waiver, defendant has failed to show the trial court plainly erred by admitting the hearsay statements. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Generally, hearsay is inadmissible, MRE 802; unless it falls under as exception in MRE 803 or 804. Under MRE 803(4), "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment" are not excluded by the hearsay rule. Statements made for these purposes are admissible "if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011). This Court has explained that apparent injury is not required. *Id.* Particularly in the context of cases of sexual assault, latent injuries such as contracting a sexually transmitted disease or psychological harm may not be physically manifested and so "a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Id.*

In this case, defendant objects to the testimony of Shamoon because she was a social worker and not a medical professional. He further argues that Shamoon's evaluation of Kr occurred four months after Kr said the abuse stopped and a police officer was present in the room. He asserts that together these facts make it unlikely that Kr made these statements for the purpose of receiving medical treatment or diagnosis.[17]

At trial, Shamoon explained that she was a psychiatric social worker. Her job was to evaluate patients for medical treatment. This included assessing patients for psychiatric care in emergency situations, and discharging those patients or creating treatment plans for them. Shamoon testified that she diagnosed patients in a psychiatric capacity and facilitated support from a psychiatrist when needed. Plain from this description, Shamoon was a medical professional. Moreover, Shamoon's testimony demonstrated that her goal in evaluating Kr was to assess her need for emergency psychiatric care. Shamoon evaluated Kr for psychiatric treatment in the emergency room shortly after Kr disclosed sexual abuse to her sister. Although the examination occurred four months after Kr reported the sexual abuse had stopped, Kr was experiencing suicidal ideation at the time. In addition to suicidal ideation, Shamoon testified that Kr had a "flat affect" and "depressed like symptoms." This supports that the statements Kr made to Shamoon were elicited to address her present need for psychiatric treatment.

The specific statements Kr made to Shamoon described the general inception, cause, and course of defendant's sexual abuse against Kr. Kr made several statements to Shamoon, including that defendant sexually abused her over an extended period of time. Shamoon offered several

---

[17] Defendant does not address whether Kr had a self-interested motivation to be truthful during the medical examination. See *Mahone*, 294 Mich App at 215. Accordingly, this Court need not address this portion of the test.

other statements from Kr: "Patient stated the rape would take place in his bedroom, and the last incident was in December of 2012. He told the patient we would not do it again and needed her to massage his back and his feet in the room and would ask her younger sister to do the same, but then he would rape the patient." The statements involved the psychological harm inflicted on Kr over the course of the sexual abuse. Kr's "complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Mahone*, 294 Mich App at 215. Defendant further asserts that the presence of a police officer in the room during the examination supported that the statements were elicited solely for the purpose of collecting evidence rather than medical treatment. This fact, which supports that the examination may have been conducted in part to investigate an alleged sexual assault, is not dispositive. See *Duenaz*, 306 Mich App at 96. Therefore, Shamoon's testimony was properly admitted under the hearsay exception for diagnosis and treatment of medical conditions. Accordingly, defendant has failed to establish error.

## VII.  DEFENDANT'S STANDARD 4 ARGUMENTS

Defendant raises two additional issues in his Standard 4 brief. He first argues that he was denied his constitutional right to present a complete defense because of the prosecution's failure to produce Dunton and Spork for trial. He also argues that he was denied his constitutional rights to present a complete defense and confront witnesses because the trial court limited his cross-examination of Commander Abro. We conclude that neither of these arguments has merit.

### A.  PRESERVATION AND STANDARD OF REVIEW

Generally, an issue is not properly preserved if it was not raised before, addressed, or decided by the trial court. *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). Moreover, an objection on one ground is insufficient to preserve an issue on a different ground. *People v Kimble,* 470 Mich 305, 309; 684 NW2d 669 (2004).

First, defendant contends that he preserved his argument that the failure to produce Dunton and Spork violated his right to present a defense by informing the trial court that Dunton and Spork were "crucial to this case." We disagree. On the last day of trial, defendant requested that the trial court compel the prosecution to produce Dunton and Spork, but he did not argue that the failure to produce these witnesses violated his constitutional right to present a defense. The day before, defendant told the trial court that these witnesses were "crucial to this case." This statement, posed the day before defendant asked the trial court to compel the prosecution to produce the witnesses, did not inform the trial court that defendant objected on the basis that his constitutional right to present a defense was violated. This issue is unpreserved. See *id*.

Second, defendant contends that he preserved his argument that the trial court violated his rights to present a defense and confront witnesses by objecting in writing to the prosecution's motion to limit his cross-examination of Commander Abro. Defendant has only partially preserved this argument. Before trial, the prosecution moved to limit defendant from cross-examining Commander Abro on a number of topics. Defendant opposed the prosecution's motion on the basis that the topics were necessary for him to present a defense. He did not argue that exclusion of these topics violated his constitutional right to confrontation. Accordingly, defendant

has preserved this issue in relation to his right to present a defense, but he has not preserved this issue in relation to his right to confront the witnesses against him. See *id*.

We review defendant's preserved claim of constitutional error de novo. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). We likewise review de novo preliminary questions regarding the admissibility of evidence. *Id*. However, preserved constitutional error that is nonstructural will not merit reversal if the error was harmless beyond a reasonable doubt. *Id*. We review defendant's unpreserved claims of constitutional error for plain error affecting substantial rights. *Id*. at 472-473.

## B. ANALYSIS

Criminal defendants have a due-process right to present a defense. US Const, Am VI, XIV; Const 1963, art 1, § 13. This right does not confer a defendant with "an unlimited right to admit all relevant evidence or cross-examine on any subject." *Hackett*, 421 Mich at 347. Rather, "an accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *King*, 297 Mich App at 474 (quotation marks and citation omitted). The rules of evidence "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *People v Unger*, 278 Mich App 210, 250; 749 NW2d 272 (2008), quoting *United States v Sheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998). Accordingly, the right to present a defense "extends only to relevant and admissible evidence." *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016) (quotation marks and citation omitted).

Additionally, criminal defendants have a constitutional right to confront the witnesses against them. US Const, Am VI; Const 1963, art 1, § 20. "A primary interest secured by the Confrontation Clause is the right of cross-examination." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). Similar to the right to present a defense, "[t]he right to confront and cross-examine is not without limits. It does not include a right to cross-examine on irrelevant issues." *People v Arenda*, 416 Mich 1, 9; 330 NW2d 814 (1982).

Defendant first argues that the trial court violated his constitutional right to present a defense when it denied defendant's motion to compel the prosecution to produce Dunton and Spork at trial and by declaring the witnesses unavailable. He contends that the failure to procure these witnesses prevented him from presenting the exculpatory and impeachment material contained in the CPS reports drafted by Dunton and Spork. We disagree.

As was discussed at length in the first issue in this appeal, the purpose for which defendant sought Dunton's and Spork's testimony would have largely constituted impermissible hearsay. Defendant offers no explanation how the prohibition against eliciting hearsay testimony from Dunton or Spork was arbitrary or disproportionate to the purpose served by the rule excluding hearsay testimony. See *Unger*, 278 Mich App at 250. Moreover, defendant had access to each of the CPS reports at trial. He did not need Dunton or Spork present to impeach witnesses with prior inconsistent statements from these reports. Accordingly, Dunton's and Spork's absence did not prevent defendant from using the impeachment materials contained in the CPS reports in his defense.

Further, the trial court had the discretion to fashion a remedy for a violation of MCL 767.40a, which may have included a missing witness instruction or reading previous testimony into the record. *People v Everett*, 318 Mich App 511, 519; 899 NW2d 94 (2017). The missing witness instruction would have instructed the jury that the testimony of the missing witnesses would have been unfavorable to the prosecution's case. M Crim JI 5.12. Defendant failed to request this instruction during trial. On appeal, he fails to assert that this instruction would have been insufficient to excuse the failure to produce Dunton or Spork. Defendant also declined to have previous testimony read into the record. Defendant was not denied his right to present a defense. Even if he could establish error, he could not establish he was prejudiced by Dunton's and Spork's absence from trial.

Defendant also argues that the trial court violated his constitutional rights to present a defense and confront witnesses by limiting his cross-examination of Commander Abro. A significant part of defendant's defense strategy was his argument that Commander Abro violated Child Protection Law by interviewing Kr himself instead of a forensic interviewer. Before trial, defendant sought extensive discovery on Commander Abro's career, personnel file, any disciplinary action, and his training and qualifications. He also sought discovery regarding all CSC cases handled by Commander Abro and the Macomb County Sheriff's Office from 2001 to 2019. This included a request for information related to the ages of children Commander Abro and other Macomb County sheriffs referred to the Care House for interviews. Defendant also sought information regarding Commander Abro's investigation of an unrelated car accident. The trial court granted the prosecution's motion to limit defendant from cross-examining Commander Abro on all of these topics, except for Commander Abro's training to handle CSC interviews. The trial court explained that, except for Commander Abro's training and qualifications, this information was irrelevant to the issue in this case of whether defendant was guilty of sexually abusing Kr and it would turn the trial into a litigation of Commander Abro and the Macomb County Sheriff's Office.

Only relevant evidence is admissible at trial. MRE 402; *Aldrich*, 246 Mich App at 114. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

The trial court correctly limited cross-examination of Commander Abro because these topics were not relevant under MRE 401. These topics largely involved collateral matters such as Commander Abro's personnel record and unrelated CSC cases. Permitting defendant to cross-examine Commander Abro on these topics was also likely to confuse the jury regarding the issues in dispute. MRE 403. Moreover, exclusion of these topics did not prevent defendant from questioning Commander Abro regarding the propriety of his investigation in this case. Defendant's right to present a defense and confront witnesses was not infringed by the exclusion of irrelevant evidence. See *Unger*, 278 Mich App at 250.

## VIII. CUMULATIVE ERROR

Finally, defendant argues each of the errors asserted in this case alone constitutes reversible error. However, assuming that these errors do not individually constitute grounds for reversal, defendant argues the cumulative nature of the errors denied him a fair trial such that he is entitled to a new trial. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Lowrey*, 342 Mich App 99, 119; 993 NW2d 62 (2022) (quotation marks and citation omitted). However, this case does not involve multiple errors. Accordingly, reversal on the basis of cumulative error is not warranted. See *People v LeBlanc*, 465 Mich 575, 591-592; 640 NW2d 246 (2002).

Affirmed.

/s/ James Robert Redford
/s/ Michael F. Gadola
/s/ Christopher M. Murray